2026 IL App (1st) 242425-U

No. 1-24-2425

Order filed July 14, 2026

SECOND DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 2024 CR 0115001 |
| | ) | |
| DESHOWN MORRIS, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Justices McBride & Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The evidence presented was sufficient to sustain defendant's convictions; the trial court did not step out of its neutral role and prejudice defendant; and the trial court did not prevent defense counsel from cross-examining witnesses about their past drug use.

¶ 2    Deshown Morris (Defendant) was arrested and charged with four counts of aggravated battery after he beat two individuals with a hammer. After a bench trial, defendant was convicted of two counts of aggravated battery with a deadly weapon and sentenced to 26 months' imprisonment. He now appeals, arguing that 1) there was insufficient evidence to

support his conviction; 2) the trial court was biased against defendant and prejudged the case; and 3) the trial court erroneously prevented defense counsel from questioning witnesses about past drug use and addiction. We disagree, and we affirm defendant's convictions.

¶ 3                                    I. BACKGROUND

¶ 4         Bodycam footage shows that around 1:30 a.m. on January 4, 2024, police responded to a call at an apartment building where a physical altercation had reportedly taken place. Police were flagged down by Felicia Banks (Banks) and Nathaniel Reed (Reed), the latter of whom had blood running down from a wound on the top of his head. Banks and Reed explained to the officers that they had been visiting a friend, "Mr. Lewis" (Lewis), who rented a room in a shared apartment in the building. The two asserted that Deshown Morris (Defendant) hit them with a hammer while attempting to force them to leave the apartment. Although he was not questioned by the officers whose points of view are represented in the bodycam footage in the record, Lewis can be heard confirming to another officer that Banks and Reed had come to visit him.

¶ 5         Officers were allowed into the apartment by Lewis. There, they spoke to and detained defendant, who asserted that he had also called the police and that Banks and Reed had injured him while he was attempting to eject them from the premises after they had awakened him making too much noise.

¶ 6         Reed spoke extensively to the officers at the scene. He stated that defendant was a new roommate of Lewis whom he had not met on previous visits over the past several months. Defendant had informed Banks and Reed that they were not allowed to visit the bathroom and, at another point in time, that they needed to leave, despite the fact that they were there visiting Lewis. Lewis told defendant the two were there visiting him. Defendant put on his

shoes, returned to the living room, assumed a fighting stance, and swung at Reed. A melee ensued in which defendant hit both Reed and Banks with a hammer, which he grabbed from Banks, while they attempted to block the blows and Reed tried to fight back using a piece of furniture he referred to as both a chair and a stool at different points.

¶ 7 Later, in the ambulance, Reed stated he fell after the first blow and was trying to hold defendant by the knee and drag him to the ground. He heard Banks say that defendant had hit her with the hammer. Reed pulled defendant to the ground, where defendant got on top of Reed and hit him in the head with the hammer. Defendant was "swinging crazy" and Reed was uncertain how many times he was hit with the hammer but "the other spots didn't appear to do no harm" because his "adrenaline was up or whatever."

¶ 8 While being treated in an ambulance on-scene, Banks stated that defendant attempted to hit her with a hammer, but she partially blocked the blow by raising her arm, so the injury to her head was minor. She also reported being hit in the shoulder but did not mention a wound there. Banks and Reed both received treatment at the scene, and body camera footage ends before the ambulances departed the scene. Defendant initially refused medical treatment but was taken to the hospital anyway for medical clearance before booking.

¶ 9 Defendant was charged with four counts of aggravated battery. Counts I and II alleged he battered and caused bodily harm to Banks and Reed, respectively, with a deadly weapon, specifically a hammer. 720 ILCS 5/12-3.05(f)(1) (West 2022). Count III alleged defendant battered Banks and caused great bodily harm by striking her about her body. 720 ILCS 5/12-3.05(a)(1). Count IV alleged defendant battered and knowingly caused permanent disfigurement to Banks when he struck her about the body. In the course of trial, Counts III and IV were dismissed.

¶ 10                                                    A. Reed's Testimony

¶ 11          Reed testified that he went with Banks to Lewis' apartment on January 3, 2024 to "hang out." The two arrived around 6:30 or 7:00 p.m. Reed stated that he drank about half a beer and joined Banks and Lewis in getting high by smoking cigarettes laced with cocaine. Defendant was present in the apartment but only socialized with the group for a portion of their visit. He asked Reed to bring him back some chicken when Reed was making a trip to a store. Reed did so.

¶ 12          Sometime after midnight, defendant began to repeatedly ask Reed and Banks when they would be leaving. Reed eventually stopped answering defendant's questions because he kept asking the same thing. This irritated defendant, who put on his shoes and a hoodie before approaching Reed "in an aggressive manner." Reed said his high from earlier in the evening had "passed over" because it was around 1:00 a.m. when defendant began to get aggressive.

¶ 13          Defendant assumed a "fight position," and Reed did so as well. Defendant "threw a punch or two" and then picked up a wood-and-metal stool, with which he hit Reed, who blocked it with his arms, grabbed it, and began "rassling for it." Reed fell to the ground in the process while defendant remained standing. Defendant kept punching him, including in the back of his head, while Reed grabbed defendant's knees and tried unsuccessfully to drag him down to the ground. Reed heard Banks asking Lewis to assist him in the fight, then saying that defendant hit her with a hammer. Reed got up off the ground and retrieved the stool with which he had earlier been hit and hit defendant with it.

¶ 14          Defendant pushed Reed, who fell between a couch and a chair. Defendant followed with the hammer, "swinging it pretty wildly." He struck Reed in the head, back, and legs while Reed was attempting to kick defendant away. Defendant then approached Banks and began

4

striking her on the head with the hammer. Reed grabbed the stool and swung it again but was pushed back and fell on the ground again. Banks again asked Lewis to help. Defendant again began to strike Reed with the hammer while he was on the floor. It was then that defendant hit Reed on top of the head and he began to bleed. Defendant went to the front door, "stood there with his foot on the door with the hammer in his hand" and said, "now ya'll going to leave." Reed was reluctant to pass by defendant and his hammer, and ultimately exited through the apartment's back door. Banks and defendant both called 911.

¶ 15　　Paramedics and the police arrived and Reed was examined medically. He had bleeding from the top of his head and had a swollen right forearm with a small hole in it. He was transported to the hospital by ambulance. He had a CAT scan, his head wound was cleaned, and his arm was bandaged. He was also given antibiotics for his head wound.

¶ 16　　On cross-examination, Reed testified that he had used heroin earlier in the day, before going to Lewis' apartment. When asked whether he had "struggled with substance abuse for some time," the State objected and the court sustained the objection. When asked if the night of the offense was his first time using illegal substances, the State again objected and the court again sustained the objection. Very shortly thereafter, Reed confirmed that his memory of the night was crystal clear. When asked if there were any details he could have forgotten, the State objected and the court sustained the objection, asking: "How would he know if he forgot something?"

¶ 17　　Reed denied that he had been in Lewis' bedroom at any point that night and stated that he did not recall if he had told police that he had been in Lewis' bedroom. Reed confirmed many details of the fight and stated that one of his injuries, a knot on his arm, was caused when defendant hit him with the stool.

¶ 18        During cross-examination, the following colloquy took place:

"DEFENSE COUNSEL (DC): You had learned just that day that [defendant] was staying there, was renting a room?

REED: No.

DC: You learned before that day that he was staying there?

COURT: That's assuming he learned it *** at some point or another. Sustained. You keep saying, 'You learned this. [Y]ou learned that.' Lay a foundation for what you're talking about.

DC: How about instead you explain to me how you knew that Mr. Lewis rented a room?

STATE: Objection.

COURT: Did Lewis rent a room?

DC: That was gone into on direct.

COURT: Just a moment, please. [Defense Counsel], don't shake your head like that. You don't have to agree with me, but don't shake your head in derision. Okay? I'm asking the witness a question. Did Lewis live there?

REED: Yes.

COURT: How long did he live there, according to you?

REED: I don't know but I been going to visit him for at least eight months.

COURT: All right. Next question. Next question. Go on.

DC: During the time that you had been visiting Mr. Lewis there, he was renting – you believe he was renting a room?

6

REED: Yes.

DC: You never saw a lease for that room?

STATE: Objection.

COURT: A lease? Sustained. Would you expect somebody to go to someone's house and say I want to see a lease that you live here? Sustained. Ask another question, please."

¶ 19                                B. Banks' Testimony

¶ 20        Banks testified that she went with her boyfriend, Reed, to Lewis' home on January 3, 2024, and arrived around 8:00 or 8:30 p.m. Banks largely testified to the same facts as Reed regarding what the two were doing there and the events of the night. She stated that they did not start smoking cocaine-laced cigarettes when they first arrived but did so later.

¶ 21        Banks testified that defendant approached Reed after asking again when they would be leaving. Reed stood up, defendant struck him and Reed fought back. Defendant grabbed a nearby stool and swung it at Reed. Reed blocked it with his arm. She beseeched Lewis to put a stop to the fight, then tried to assist Reed, who had fallen on the floor. Banks stated that she "saw [defendant] looking" and tried to figure out what he was looking at. She believed it to be a hammer near the door, so she retrieved the hammer and tried to give it to Reed to help him defend himself. Instead, defendant took the hammer from her, pushed her away, and began to beat Reed with the hammer.

¶ 22        Banks attempted to pull defendant off Reed. Defendant turned and struck Banks in the back of the head with the hammer. Banks testified that "the first strike didn't bust my head." She stated defendant continued to hit her "about two or three times, then the skin broke which busted my head." She tried to grab defendant, but defendant pushed her away and

went back to hitting Reed who was "in a daze" and could not get up off the floor. Defendant alternated attacking Reed and Banks.

¶ 23 Banks said during the attack: "Nathaniel, my head bust. He bust my head." Reed then picked up the stool and held it aloft, leading to a pause in the fight where neither man was swinging at the other. Reed eventually threw the stool as he and Banks were "trying to just go." Defendant went to the front door, hammer in hand, and opened the door. Both defendant and Banks began calling the police. Reed and Banks exited through the back door to avoid passing by defendant.

¶ 24 Banks confirmed that she had no injuries before the fight, but upon being taken to the hospital, had minor bruises to the arm and chest, as well as a "busted head" that was treated with two staples.

¶ 25 On cross-examination, Banks confirmed that she struck defendant after he struck her. She denied ever stating to EMTs that she did not want stitches. When shown the bodycam footage, she confirmed that she did state "I don't need no stitches." That statement was made prior to receiving the two staples.

¶ 26                                C. Subsequent Proceedings

¶ 27 After Reed's and Banks' testimony, the State rested. Defendant moved for a directed finding, arguing that the State had not proved the elements of the counts charged. The court dismissed Count IV, which required a showing of permanent disfigurement, but denied the motion as to the other three counts.

¶ 28 Defendant called only one witness: Detective Sarah Rodenberg of the Chicago Police Department (Rodenberg). Rodenberg testified that her understanding was that an evidence

technician had retrieved a hammer from the kitchen sink of the apartment before she arrived. She stated that defendant was taken to the hospital as well and was treated for minor injuries.

¶ 29 The court interrupted defense counsel a number of times both during the examination of witnesses and during defendant's closing argument, and displayed impatience and frustration with defense counsel's lines of questioning and arguments. Rather than recount numerous additional instances here in addition to the colloquy above, we will provide specific language in our analysis where the language is pertinent.

¶ 30 After the bench trial, the court found defendant guilty of Counts I and II, but not guilty of Count III, and sentenced him to 26 months' imprisonment.

¶ 31                                    II. ANALYSIS

¶ 32 Defendant advances three arguments on appeal: that (1) the State failed to present sufficient evidence to support defendant's convictions, (2) the trial court abandoned its role as a neutral arbiter and showed bias against defendant, and (3) the trial court abused its discretion when it prevented defense counsel from inquiring about Reed's and Banks' history with drug use.

¶ 33                            A. Sufficiency of the Evidence

¶ 34 Defendant asserts that because Reed and Banks are, as individuals, not capable of giving testimony that any rational trier of fact could credit, and because the vast majority of the evidence presented at trial consisted of their testimony, the State did not present sufficient evidence to support defendant's convictions. Defendant also indicates specific inconsistencies, both between their respective accounts and between their accounts and prior inconsistent statements.

¶ 35    "It is well settled that, when reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383, ¶ 25. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *Id.* "This court will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create reasonable doubt of defendant's guilt." *Id.* As the trial court is the factfinder in bench trials, its "findings concerning credibility are entitled to great weight." *People v. Rainey*, 2025 IL App (1st) 231769, ¶ 21 (citing *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007)). "When findings of fact depend on the credibility of the witnesses, we will defer to the trial court's findings unless they are against the manifest weight of the evidence." *Id.* "The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *People v. Smith*, 185 Ill. 2d 532, 541 (1999).

¶ 36    Defendant's convictions are for aggravated battery under section 12-3.05(f)(1), which states: "[a] person commits aggravated battery when, in committing a battery, he or she *** [u]ses a deadly weapon other than by discharge of a firearm***." 720 ILCS 5/12-3.05(f)(1) (West 2022). "A person commits battery if he or she knowingly without legal justification by any means (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3 (West 2022). As such, the question before us is whether the evidence presented, when interpreted in the light most favorable to the prosecution, and with all reasonable inferences drawn in favor of the

prosecution, could show that defendant knowingly used a deadly weapon to harm someone or make physical contact of an insulting or provoking nature with someone.

¶ 37                                    1. Inconsistencies

¶ 38        Defendant's sufficiency of the evidence argument is entirely focused on the credibility of Reed and Banks as witnesses, and contains arguments based on generalities about the two as individuals and more specific points regarding their testimony. We begin with the latter: defendant's assertions that both of the key witnesses made prior inconsistent statements that contradict their testimony, and that their stories contradict one another.

¶ 39        Banks testified at trial that she was hit multiple times in the head and only the last blow "busted" her head. Bodycam footage shows her informing a paramedic that she had been hit once on the head with the hammer. Given that Banks testified that only the third blow broke the skin, it would be reasonable to infer that she was intending to tell the paramedic about her wounds instead of delivering a blow-by-blow account of the fight. Defendant raises no other prior inconsistent statements from Banks, and defendant does not claim that Banks' testimony was internally inconsistent in any way.

¶ 40        Defendant points out that Reed's assertions at the scene of the offense differ in some ways from his testimony at trial. He said at the scene that defendant rented a room in the apartment, then testified that he did not know whether defendant rented a room; he testified that the altercation took place in the living room, yet Detective Rodenberg testified that Reed told him that part of the altercation took place in Lewis' bedroom; and Reed testified that his recollection of the night of the offense was "crystal clear," yet he was unable to recall various details when asked. Furthermore, defendant asserts that Reed's and Banks' stories do not

11

corroborate one another, because, for instance, they testified to different times of arrival at Lewis' apartment.

¶ 41     Defendant also argues that Reed's account of the fight was inconsistent. The inconsistencies alleged are numerous. Some are not inconsistencies at all, such as the fact that Reed testified that defendant "threw a punch or two" and he "did the same," after which defendant picked up the stool and attacked Reed with it, yet later Reed describes being repeatedly struck by defendant. These two statements are not inconsistent in any way, and defendant's argument as to how they are is unclear. Other inconsistencies are speculative, such as defendant's argument that Reed's description of defendant "swinging the hammer wildly" does not match the injuries Reed sustained. No expert testimony was provided at trial suggesting that the injuries did not match the story provided, nor did any police officer or paramedic state on bodycam or testify at trial to that effect.

¶ 42     Our supreme court has stated unequivocally that "[a] conviction will not be reversed simply because the evidence is contradictory or because defendant claims that a witness was not credible." *People v. Gray*, 2017 IL 120958, ¶ 36. To succeed at a sufficiency of the evidence claim based on witness credibility, an area where we give great deference to the trial court's assessment, the testimony provided must be so flawed that "*no reasonable person* could accept it beyond a reasonable doubt." (Emphasis added.) *Id.*

¶ 43     In *Cunningham*, our supreme court was presented with a drug arrest in which the arresting officer's narrative included questionable and bizarre statements that (1) he encountered a man in jeans and a t-shirt on the street in Chicago in mid-December, (2) the oddly-dressed individual flagged him down to tell him about someone selling drugs, despite the fact that he was patrolling in plain clothes, and (3) when defendant arrived in a station

wagon to sell drugs to the undercover officer, that officer openly accessed his radio to inform other officers that the seller had arrived, despite his record as an undercover officer with ten years of experience. *People v. Cunningham*, 212 Ill. 2d 274, 280-81 (2004). Our supreme court found these pieces of testimony to be questionable, but it concluded that "[w]here the record is not such that the only inference reasonably drawn from flaws in the testimony is disbelief of the whole, a reviewing court should bear in mind that the factfinder had the benefit of watching the witness' demeanor." *Id.* at 284. Here, just as in *Cunningham*, we are left with reasonable inferences that the trial court could have made in crediting Reed's and Banks' testimony, despite contradictions, to support defendant's convictions.

¶ 44                                  2. Felon Status and Drug Use

¶ 45        We began this section with a statement that might sound hyperbolic: that defendant argues Banks and Reed cannot provide credible testimony. Defendant posits that Banks and Reed have felony convictions in their past and were both using illegal drugs on the night of the offense. Both of these are factors that may be considered in assessing witness credibility. However, as we will explain below, defendant treats the idea that these statuses equate to lack of credibility as a self-evident truism ignored by the court rather than a matter that was weighed as the factfinder saw fit.

¶ 46        Defendant's argument regarding the witnesses' status as felons relies upon solid law, Rule 609 of the Illinois Rules of Evidence, which states that past felony convictions can be used to attack the credibility of a witness. Ill. R. Evid. 609 (eff. January 1, 2011). Banks was convicted of felony retail theft, which, as defendant notes, is a crime of dishonesty that has higher probative value when introduced to impeach a witness. *People v. Diehl*, 335 Ill. App.

13

3d 693, 704 (2002). Reed was previously convicted of armed robbery, and his sentence was discharged in 2015.

¶ 47    Defendant asserts in his brief that Banks' conviction was "something the court never considered during the course of the trial." Defendant cites nothing in the record to back up this assertion and pursues no further this serious allegation that the court disregarded evidence. Although the trial court did not explicitly mention Banks' conviction, it has long been the case that "even though it may be desirable for the trial court to explain its decision, the court's election not to comment or its failure to specifically mention certain portions of the testimony does not permit a defendant on appeal to claim that those portions not mentioned played no role in the court's determination." *People v. Curtis*, 296 Ill. App. 3d 991, 1000 (1998).

¶ 48    More troubling is defendant's analysis on the matter of the witnesses' drug use. Defendant begins his discussion of Banks' credibility by stating that "Banks' testimony in light of her admissions to drug and alcohol use and her conviction for a crime of dishonesty was not credible." Defendant then cites to cases from 1972 and 1985 for the proposition that a witness' status as a narcotics addict is relevant to credibility and that "the testimony of a narcotics addict is subject to suspicion due to the fact that habitual users of narcotics become notorious liars." *People v. Strother*, 53 Ill. 2d 95, 99 (1972); see also *People v. Collins*, 106 Ill. 2d 237, 271 (1985). No evidence was presented at trial that Banks or Reed were narcotics addicts. In fact, one of defendant's arguments on appeal is that the court erred by not allowing defense counsel to question Banks and Reed on their history with drugs.

¶ 49    Defendant faults the trial court for stating, while rendering its verdict: "I don't see any big deal about the fact they used narcotics." The decision to put little to no weight on the

witnesses' drug use is the court's decision to make as the finder of fact. *People v. Bobo*, 2020 IL App (1st) 182628, ¶ 42 ("The factfinder determines the credibility of witnesses and the weight to be given to their testimony, and this court will not substitute its judgment for that of the [factfinder] on these matters.").

¶ 50      Illinois law has long held that drug use and addiction were potentially relevant but did not obligate a trier of fact to disregard a witness' testimony. For example, this court previously opined:

> "Illinois courts have uniformly held that drug addiction at the time of trial or when the crime occurred may affect credibility due to the impairment of testimonial powers. Credibility is affected because addiction may influence the capacity of the witness to observe, to receive accurate impressions and retain them in his memory. Furthermore, addiction should be considered because of its effect upon the power and inclination of the witness to be truthful.
>
> Some courts have gone so far as to conclude that habitual users of narcotics become notorious liars. (*People v. Strother* (1972), 53 Ill.2d 95 ***; *People v. Smith* (1973), 12 Ill.App.3d 488 ***) On the other hand, the non-credibility of addicts is not universally accepted. McCormick on Evidence points out that: 'it can scarcely be contended that there is enough scientific agreement to warrant judicial notice that addiction in and of itself usually affects credibility.' McCormick, Evidence, s 45, at 95 (2d ed. 1972)." *People v. Smith*, 70 Ill. App. 3d 250, 256-57 (1979).

¶ 51      The 1979 *Smith* case was not alone in its relative nuance on the matter. *People v. West*, 156 Ill. App. 3d 608, 612 (1987) (Highlighting courts' willingness to allow impeachment via testimony on drug addiction, but their reluctance to instruct juries to give addicts' testimony

extra scrutiny.); *People v. Cepolski*, 79 Ill. App. 3d 230, 238 (1979) ("While the fact that the complainant is a narcotics addict is an important factor in determining his credibility, even if it is shown that the complainant was in fact using drugs at the time of the incident, this consideration alone does not necessarily destroy his credibility."); *People v. Johnson*, 87 Ill. App. 2d 390, 395 (1967) ("The credibility of a narcotics addict is for the trier of facts to determine, although drug addiction must be considered in the determination of the addict's veracity as a witness."); *People v. Romero*, 54 Ill. App. 2d 184, 188 (1964) ("Although the testimony of a narcotic[s] addict is scrutinized with caution, his testimony may be sufficient to sustain a conviction if it is credible under the surrounding circumstances."); *People v. Larry*, 30 Ill. 2d 533, 536 (1964) ("While a witness's addiction to narcotics has an important bearing upon his credibility, it does not follow that his testimony must always be disbelieved.").

¶ 52     To be clear, our intention in belaboring this point is not to say that drug use, addiction, or past felonies, for that matter, are inappropriate credibility considerations. Our point is that a finder of fact is not obligated to change its analysis because a witness is a convicted felon or drug user, especially where the inconsistencies in the witness' testimony do not rise to a level at which the witness' testimony cannot reasonably be credited. The trial court, as the factfinder, was presented with testimony as to Reed's and Banks' past, and gave the information the weight it determined to be appropriate. Defendant alleges that the court disregarded or was unaware of evidence, yet provides no evidence or argument that the witness' felony status or drug use was specifically relevant, given the circumstances. Without such specificity, defendant's argument is essentially that a court *cannot* credit the testimony of a drug user or a felon. This is not a legally defensible position.

¶ 53     Here, there is no such reason to doubt Banks and Reed based on these statuses. At trial, defense counsel repeatedly advanced the argument that there was no evidence presented that Banks and Reed had been invited into the apartment and so they could have been motivated to lie to the police about what had occurred if they were there illegally. However, this argument holds no water, as Lewis can be clearly heard in the bodycam footage stating that he invited them over. Nothing else in evidence or in defendant's arguments suggests that Reed or Banks were impaired by drug use or motivated for any other reason to lie.

¶ 54     With all of that said, we find that, viewing the facts in the light most favorable to the prosecution, a reasonable trier of fact could find defendant guilty of the charges for which he was convicted.

¶ 55                                B. Judicial Bias

¶ 56     Defendant argues that "the trial court abandoned its role as a neutral and impartial arbiter of fact when it repeatedly interrupted the defense's closing argument, going beyond clarification and showing it had prejudged the case." Defendant concedes that this issue was not raised below and therefore not preserved for appeal. He asks us, instead, to review it under the plain error doctrine.

¶ 57     "To preserve a purported error for appellate review, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Williams*, 2022 IL 126918, ¶ 48. "Failure to do so either results in forfeiture of such review, but the forfeiture may be excused when the error is 'plain.' " *Id*. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). "The plain-error doctrine does not create a 'general savings clause' to allow defendants to escape the consequences of their nonfeasance." *Williams*, 2022 IL

126918, ¶ 48. "Instead, it offers a narrow exception to the rule of procedural default for unpreserved errors." *Id*. "Whether there is plain error is a question of law, which we review *de novo*." *Id*.

¶ 58    The plain error doctrine establishes two categories, or prongs, of plain error: "prejudicial errors, which may have affected the outcome in a closely balanced case, and presumptively prejudicial errors, which must be remedied although they may not have affected the outcome." *People v. Nitz*, 219 Ill. 2d 400, 415 (2006) (citing *People v. Herron*, 215 Ill. 2d 167, 185 (2005)). Defendant's assertion that the judge failed to maintain a neutral, unbiased position throughout the trial is reviewable under the second prong, as it would be, if proven, "a systemic error which serves to erode the integrity of the judicial process and undermine the fairness of the defendant's trial." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 614 (2010).

¶ 59    "A criminal defendant who elects to be tried in a bench trial 'is entitled to the same fair, patient, and impartial consideration he would be entitled to by a jury composed of fair, impartial, careful and considerate jurors.' " *People v. Jackson*, 409 Ill. App. 3d 631, 646 (2011) (citing *People v. Trefonas*, 9 Ill. 2d 92, 100 (1956)). "The trial court has the right to question witnesses in order to elicit the truth or to bring enlightenment on material issues which seem obscure." (Internal quotation marks omitted.) *Id*. "A trial judge's questioning of a witness must be done in a fair and impartial manner, without showing bias or prejudice against either party." (Internal quotation marks omitted.) *Id*. at 646-47. Although the danger of prejudice resulting from a trial judge's questions is lessened in a bench trial, the court abuses its discretion when it adopts the role of an advocate for one of the parties. *Id*. at 647; see also *People v. Griffin*, 194 Ill. App. 3d 286, 296 (1990) ("[T]he danger of prejudice due

18

to judicial questioning decreases sharply in cases tried without a jury."). "To show prejudice in a bench trial, the defendant must show that the tenor of the court's questioning indicates the court has prejudged the outcome before hearing all of the evidence." (Internal quotation marks omitted.) *Id.*

¶ 60    Furthermore, a trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party making the charge of prejudice. *People v. Romero*, 2018 IL App (1st) 143132, ¶ 96. "In order to show bias, defendant must demonstrate that the judge displayed 'active personal animosity, hostility, ill will, or distrust toward the defendant.' " *Id.* (quoting *People v. Shelton*, 401 Ill. App. 3d 564, 583 (2010)). However, "[t]he fact that a judge displayed irritation or displeasure with the defense is not necessarily evidence of judicial bias against defendant." (Internal quotation marks omitted.) *People v. Moore*, 2023 IL App (1st) 211421, ¶ 124. "We review *de novo* the question of whether the trial judge's conduct requires reversal of the judgment." *Id.*

¶ 61    In his brief, defendant cites, across 23 different pages of the record of proceedings, various instances in which the court interrupted defense counsel or made allegedly impermissible comments. Some of the cited instances are patently absurd. For instance, when defense counsel was focusing on how minor Reed's head wound was, the court interrupted to clarify that the charge did not require great bodily harm, but only bodily harm. It is difficult to see how this could be seen as an illustration of bias, or even contributive to demonstrating a broader pattern of bias. The severity of Reed's injuries was utterly irrelevant to the question of whether defendant's actions satisfied the necessary elements of the crime. On the following page, the court interrupted a mention of photographs to ask the State to show it the photos of the injury. These interruptions in no way show bias or a lack of neutrality.

19

¶ 62        Immediately thereafter, the following colloquy occurred:

"Defense Counsel (DC): So, Judge, as the Court knows with no paramedics, nurses, doctors being called to the stand, no reports – medical reports, records being entered, we can make a reasonable inference that there was in fact no injury; right?

COURT: Why do you say that? Why do you say that?

DC: Well, Judge, we know the State's got the burden; right? They have to prove that there's bodily harm.

COURT: Correct.

DC: And so all we have is his word, and I am going to go into his credibility, but all we have is his word. There was no corroboration of that is what I'm saying. The inference is that if there was some injury, it's the State's burden to put those witnesses on to prove it. Absent that, the presumption of innocence remains with my client.

COURT: Are you suggesting that given a case where a person is charged with hypothetically aggravated battery – not this case, a hypothetical case. The State would have to bring in a doctor or nurse, I treated them for this and that. The guy could say, well, he cut me, my arm. I didn't bother going to the hospital but he did cut me, I was bleeding.

DC: I think it is up to the factfinder in that situation to determine the credibility of that witness, and as I said I am going to go into the credibility of that witness who testified to using heroin during the day and then smoking cocaine throughout the night while also drinking. I will not forget to do that, I promise the court. ***"

¶ 63    Defense counsel continued speaking for two full pages of transcript before the following exchange:

"DC: So, Judge, [Banks] wasn't coming – and, again, if we want to talk about credibility of witnesses and reasonable inference, she wasn't coming over [to defendant] to say hi, how are you. She said she came over to help [Reed], and then later in the testimony when asked if she struck [defendant], she said, yeah, I struck him after he struck me. That was her self-serving testimony was that she did admit to striking him after he struck her.

COURT: I'm just curious. You keep saying self-serving testimony. Whatever somebody says is self-serving in some sense or another, isn't it? The guy shot me; that's self-serving by the person who got shot. I came over to help my boyfriend. That's sort of self-serving, but if the evidence shows that, the evidence shows that. Any person who testifies [to] something is self-serving in some sense or another. That's why they're offering them up as witnesses, it's something to add to the State's case. If they say nothing happened, they probably wouldn't even have been called to begin with most likely. All right. Go ahead. Sorry to interrupt.

DC: You're fine, Judge. I believe that by the time I'm done that I will have responded to all of that adequately and I believe the Court will agree."

¶ 64    Shortly thereafter, the court and defense counsel engaged in another lengthy exchange prompted by defense counsel's mention of Banks being on a blood-thinning medication and the court questioning the relevance of that fact. After the court mentioned in passing that Banks and Reed were invited up to Lewis' apartment, defense counsel insisted that there was no evidence supporting that statement, in continuation of his ongoing argument that there

was no evidence that Banks and Reed were in the apartment legally. The court's frustration with that argument was palpable in the transcript of the ensuing back-and-forth:

"DC: Judge, when you say he asked them to come up here, [Lewis] didn't testify.

COURT: All right. Go on. You are missing the point. Go on.

DC: I'm not missing the point if the Court believes that there is evidence of an invitation.

COURT: Let's assume hypothetically –

DC: That's hearsay.

COURT: Let's assume a friend of mine wants to come down to 26th and California to see a trial. I say, Hash – that's his name – Hash, come up to Room 602, and he does, do you need someone else to say I heard Sacks tell him come to 602? I asked Hash, come up for the trial next week, come up and watch the trial. He does come up. Walks in the audience, has a seat, watches the trial. You mean I have to have some corroboration to say I told Hash to come up to Room 602 and someone else heard me tell him that?

DC: Judge, the – this hypothetical if the Court wishes me to indulge in it, is referring to a courtroom that is open to the public; right? This is an apartment that by their own testimony is a private residence.

COURT: It's a big room with bedrooms off on the sides, three bedrooms.

DC: It's an apartment, Judge. The testimony was that it's an apartment building with multiple apartments. Within the apartment building, there is an apartment that has three bedrooms.

COURT: Correct.

22

DC: And that apartment with three bedrooms has different subletters of those three bedrooms.

COURT: And the big room is used if anybody wants to use it, to watch TV, use heroin, use cocaine.

DC: Again, that's assuming facts that aren't in testimony. This is – your Honor is saying that this is a big room that anybody who wants to can use it.

COURT: I didn't say anybody. If someone was invited up there, they could use it.

DC: And what evidence do we have here other than them saying they went to visit a friend that they were invited to it?

COURT: Okay. What else would you possibly have? Someone comes up to my – come up to the crib, we'll smoke a joint together. You need a witness to say I heard him say come up to the crib and we'll smoke a joint together?

DC: Judge, I will go down this path as long as your Honor wants me to, but I'm not disputing that those individuals were in that apartment. What I am saying –

COURT: You're disputing they were – they were there illegally however.

DC: Judge, there is no evidence other than their own testimony of whether they were there legally or illegally.

COURT: What else would you expect? What else would you expect?

DC: The Court repeatedly says that they were there by invitation.

COURT: What else –

DC: I have the transcript –

COURT: Counsel, I read it last night.

23

DC: There is no testimony that there was ever an invitation.

COURT: Just answer my question, would you please. I read the transcript again last night. What else would you possibly expect? Come up to my crib, we'll smoke a joint together. You need a witness to that?

DC: So the court is assuming there was an invitation.

COURT: There was testimony about that. Go on.

DC: Sure. Where should I refer to in the transcript that your Honor read last night?

COURT: Just go ahead, please, Counsel.

(Brief pause.)

DC: While I'm looking through the transcript, Judge, I do want to reiterate that as much as the court has pushed back on my use of lack of corroboration –

COURT: What do you mean by pushing back, Counsel?

DC: Inquired about. I will –

COURT: Right. Use a better phraseology than pushing back. Please, go on. I'm not pushing back on anything at all. I'm just asking a question or making a comment.

DC: Judge, there is an individual [referred to as Lewis] – who both witnesses say – who never came and testified; right? He wasn't here, he's the one who holds this answer, and it's not our burden to have him say they're allowed here, they're not allowed here.

COURT: I'm not saying it is your burden. I never said that."

¶ 65    This back-and-forth continued for some time. Under *Liteky*, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings *** do not constitute a basis for a bias or partiality motion unless they display a

deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. U.S.*, 510 U.S. 540, 555 (1994). Judicial remarks during trial, even if critical, disapproving, or even hostile, "ordinarily do not support a bias or partiality challenge," absent an extrajudicial source for the opinion or else the kind of favoritism or antagonism that would make fair judgment impossible. *Id*. While the court's exchange with defense counsel may have been both critical and disapproving, we see no evidence of favoritism or antagonism.

¶ 66    When defense counsel stated that defendant was not using the narcotics that the others were using, the State objected, to which the court responded: "I heard the evidence. I'll hear the closing arguments. I'll make my ruling eventually. Overruled. Go on."

¶ 67    The court continued interjecting during defendant's closing argument. While defense counsel attempted to portray defendant as less culpable because he did not enter the fight with the hammer in hand and so had no intention to commit an aggravated battery, the court interjected with questions about how that changes anything, seemingly to get at the core question of how it affected whether or not defendant's actions satisfied the elements of aggravated battery. Defense counsel focused on the fact that Banks testified to introducing the hammer into the fight, at which point the court interrupted to note that although Banks introduced the hammer, defendant took it from her. Defense counsel expressed confusion about what distinction the court was suggesting, to which the court responded: "I'm not suggesting anything. I'm just making a comment. Go ahead." As defense counsel delved into a theory that defendant was engaging in self-defense, the court continued to question him, specifically about the necessary mental state of someone engaging in self-defense. Defense counsel continued to engage with the court, even when the court advised him to continue, and the following discussion took place:

"DC: There was also a – well, so, Judge, the Court seems to indicate that [defendant] is at fault for intercepting the hammer. The alternative of that point is that he allows Reed to get the hammer and then himself is a victim of the hammer.

COURT: Try not to read – try not to read my mind, Counsel. Try not to read my mind. Just go on.

DC: I'll just speak to common sense since the standard is a reasonable person. Common sense is any –

COURT: So that means – hold on a second, Drew. You just argued common sense. You mean I don't have any?

DC: Judge, I – you just said that you don't want to speculate and I can't read your mind. Now it seems that your Honor is trying to read my mind. I said nothing of the sort, and I do not believe –

COURT: Just finish your argument. Just finish your argument, would you please, Counsel. Just finish your argument and let's move on. I'm not reading your mind and you're not reading mine. Just go ahead."

¶ 68     Defense counsel then argued for several more pages of transcript virtually uninterrupted before concluding his closing argument. While defendant is correct that the court did not choose to interrupt the State's closing argument, that argument spans only two pages of transcript. Defendant's closing argument, by comparison, spans 47 pages, with about 18 of those consisting of questions or comments from the court and responses thereto. Given that the court had very little time to interrupt or question the State's very brief closing argument, we do not see its decision to interrupt and question only defense counsel as evidence of bias or prejudice.

¶ 69    Defendant compares his case to *Crawford*, which similarly concerns a bench trial wherein the trial judge frequently interrupted defense counsel. *People v. Crawford*, 343 Ill. App. 3d 1050 (2003). Although *Crawford* is in many ways similar to our case, it is distinguishable because the tenor and content of that trial judge's interjections indicated that he had prejudged the case and evinced not only doubt, but outright hostility toward defense counsel's theory of the case. Unlike here, the judge in *Crawford* interrupted defendant's opening statement to question whether certain evidence corroborated the allegations, despite the fact that no evidence had yet been presented. *Id*. at 1060. Furthermore, the trial judge in *Crawford* interrupted defense counsel's closing argument twice within the first four sentences, in one instance expressing a sort of outraged incredulity, saying: "So it's okay. Then it's okay. If she's—if she's some trollop that's going around smoking crack or weed or drinking beer, and she's not old enough, she has no right to say no." *Id*. Lastly, the *Crawford* court accused defense counsel of misrepresenting the evidence by asserting that the physical evidence of sexual assault that was presented could also be the result of a consensual act. *Id*.

¶ 70    We do not find the comments made by the trial judge during our defendant's closing argument to be indicative of bias, or of having prejudged the case. His questions and comments undoubtedly carried a tone of considerable impatience and irritation. They did not, however, evince prejudice against the defense, and unlike in *Crawford*, the court's interjections did not demonstrate prejudgment of the facts or merits before the court had the chance to consider the evidence. Given that this was a bench trial, we need not worry about whether the tenor of the court's comments or any view of the facts implicit in its comments might influence the finder of fact.

¶ 71 More comparable is *Faria*, in which the trial judge similarly expressed irritation and impatience with defense counsel, and in harsher terms than in our case. *People v. Faria*, 402 Ill. App. 3d 475, 479-80 (2010). In *Faria*, the court was so dissatisfied with defense counsel that it contacted the attorney's supervisor, and even that level of dissatisfaction was insufficient to show bias. *Id*. at 481-82. The trial judge in *Faria*, as here, interrupted repeatedly, and even commented, at the end of the defense's closing argument: "Okay. I would normally let you argue [defense counsel], but I can't stand it so I have to actually go on." *Id*. at 482. The key similarity between *Faria* and the case before us is that although the trial judges in both cases found defense counsel to be vexing, neither made any statements showing a prejudgment of the case or bias that would prevent the judge from arriving at a fair judgment. This court concluded that the judge in *Faria* had not erred, despite having used more hostile language. As such, we do not believe that the tenor of the comments from the trial judge in the case before us evinces bias.

¶ 72 We additionally see no evidence that the court's interruptions, frequent and sometimes lengthy though they may have been, prevented defense counsel from presenting a robust closing argument. In *Crawford,* this court opined that "most of defense counsel's closing argument was interrupted," *Id*. at 1060, but here, defense counsel was able to speak uninterrupted for a large portion of the closing argument. Defendant argues that the court's "pushing back" on his arguments shows that the court did not consider those arguments. On the contrary, it could be fairly argued that the trial court's so-called "pushback" demonstrated its consideration of the arguments, given that consideration is a necessary prerequisite to forming relevant questions. It is arguable that the court's questioning was favorable to the defendant in that it gave defense counsel the opportunity to understand the court's

interpretation of the facts and to be aware of which of its arguments were not proving persuasive so that it could adapt its arguments accordingly.

¶ 73     Defendant further argues that the trial court interfered with attempts to impeach Reed by sustaining objections made by the State. With one exception, which we will address in the next section, defendant makes no argument that any of the court's evidentiary rulings were erroneous. If the court's rulings were not incorrect, we see no way they could be indicative of bias against defendant except in their tone and in commentary that accompanied them. Defendant quotes the following exchange:

> "DC: How about instead you explain to me how you knew that Mr. Lewis rented a room?
>
> STATE: Objection.
>
> COURT: Did Lewis rent a room?
>
> DC: That was gone into on direct.
>
> COURT: Just a moment, please. [Defense counsel], don't shake your head like that. You don't have to agree with me, but don't shake your head in derision. Okay? I'm asking the witness a question. Did Lewis live there?
>
> REED: Yes.
>
> COURT: How long did he live there, according to you?
>
> REED: I don't know but I been going to visit him for at least eight months."

¶ 74     The court's comment on defense counsel's reaction could be said to evince annoyance or frustration, but our analysis is the same here as with defendant's closing argument.

¶ 75     Beyond the court's words themselves, the surrounding context of the court's handling of the case does not suggest a biased judge. For instance, the court was receptive to the

defense's arguments that led to the dismissal of two of the four charged counts. As the State points out in its brief, although the court interrupted frequently or seemed irritated with defense counsel, it never declined to listen to or consider the defense's arguments, even where it expressed confusion about defense counsel's reasoning. At the close of trial, the court even said to defendant: "[Y]ou have a good lawyer. We happen to disagree, but that's life. You don't always agree with things. Okay?" We find that the trial court did not abandon its neutral role and therefore did not err. Since there was no error, there was no plain error, and this issue is forfeited.

¶ 76                              C. Evidentiary Rulings at Trial

¶ 77        Defendant argues on appeal that the trial court abused its discretion by preventing defense counsel from further cross-examining Reed on his drug use beyond what he had used on the night of the offense.

¶ 78        "The confrontation clause of the sixth amendment of the United States Constitution guarantees a defendant the right to cross-examine a witness." *People v. Pacheco*, 2023 IL 127535, ¶ 45; U.S. Const., amend. VI. "A criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which … [one] could appropriately draw inferences relating to the reliability of the witness." *Pacheco*, 2023 IL 127535, ¶ 45 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). However,

> "[t]he trial court possesses wide latitude to impose reasonable limitations on cross-examination based on concerns about harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or of little relevance, and it may

impose certain restrictions on cross-examination so long as those restrictions serve legitimate interests in the criminal trial process and are not arbitrary or disproportionate to the purposes they are designed to serve." (Internal quotation marks omitted.) *Id.* ¶ 47.

¶ 79      "[W]hen reviewing a confrontation clause challenge, we do not 'isolate the particular limitation on cross-examination to determine whether reversible error occurred.' " *Id.* ¶ 48 (quoting *People v. Harris*, 123 Ill. 2d 113, 145 (1988)). "Instead, we look to the record as a whole, including the necessity for the limitation and the alternative means open to the defendant to impeach the witness." *Id.* "If a review of the entire record reveals that the fact-finder has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because the defendant has been prohibited on cross-examination from pursuing other areas of inquiry." *Id.* "Ultimately, the question in each case must be whether defendant's inability to make the inquiry created a substantial danger of prejudice by depriving him of the ability to test the truth of the witness' direct testimony." (Internal quotation marks omitted.) *Id.* "Whether cross-examination has satisfied constitutional scrutiny is a question of law we review *de novo*." *Id.*

¶ 80      As the specifics of defense counsel's cross-examination are pertinent, we include here the whole of the exchange on the subject, which took place at the very beginning of cross-examination:

"DC: You started smoking crack cocaine at the residence at approximately 6:30 or 7:00 that night?

REED: Yes.

DC: You had also used crack cocaine earlier in the day that day?

REED: No.

DC: Just heroin?

STATE: Objection.

COURT: The way the question is phrased, sustained.

DC: You used heroin earlier in the day that day?

STATE: Objection.

COURT: He can answer that. Overruled.

* * *

REED: Earlier that day, yes.

COURT: All right.

DC: And you also continued to use heroin after arriving at that residence?

REED: No. Just smoking cigarettes laced with cocaine.

DC: And that was multiple cigarettes laced with cocaine; correct?

REED: Yes.

DC: You have struggled with substance abuse for some time?

STATE: Objection.

COURT: Just a minute. Sustained.

DC: Was this the first time – this was not the first time you had ever used illegal substances; correct?

REED: No.

STATE: Objection.

COURT: Objection sustained. Disregard the answer "no."

¶ 81    Defense counsel changed the subject and pursued the question of Reed's history with drugs no further. Later in cross examination, without any context related to drug use, defense counsel asked: "Are you under the influence of any narcotics today?" Reed answered: "No."

¶ 82    Defendant argues, based on the above exchanges alone, that defense counsel "was not allowed to elicit *any* testimony about Reed's drug use other than his use of heroin and cocaine on the date of the incident and that he was not under the influence at the time of his testimony." The highlighted exchange, and the record more generally, do not support this assertion, as defense counsel was never instructed not to ask further questions on the topic.

Defendant acknowledges that this court has permitted foreclosure of further evidence of drug use where some such evidence had been presented to the factfinder. *People v. Pitchford*, 314 Ill. App. 3d 72 (2000). In that case, Jefferson, the sole eyewitness to a murder, testified that he was a heroin user, that he was not using heroin on the night of the offense because he was on medication after a hospital stay, and that although he had not used any drugs within six hours before testifying, he had done so sometime within the preceding 24 hours. *Id*. at 75. The defense called a woman who lived with Jefferson to testify about his drug use. *Id*. at 81. After "several objections" sustained by the trial court, the defense made an offer of proof, pursuant to which the witness testified that Jefferson used drugs "every day and all day" and that she spoke to him on the telephone the morning that he testified, and "determined from the tenor of the conversation that he had used narcotics that morning." *Id.* at 81. The court found that that determination was one "a jury is capable of ascertaining for itself." *Id*. Despite the offer of proof, the court sustained the objection and prevented the witness from offering the testimony. *Id*. This court found that the trial court had not abused its discretion in doing so, as "testimony of Jefferson's drug use was otherwise presented" and "we [did] not

33

believe that prejudice resulted from the exclusion of [the witness'] testimony on that point."

*Id*.

¶ 83    Here, defense counsel was not prohibited from eliciting further testimony on the subject at all. Defense counsel asked two questions, the State made two non-specific objections, and the court sustained both. Defense counsel did not argue the point further and did not make an offer of proof. We see nothing about the exchange that warned defense counsel against further pursuing the subject either explicitly or implicitly. As such, defendant's right to confront his accusers was not violated and the court did not abuse its discretion.

¶ 84                                    III. CONCLUSION

¶ 85    For the foregoing reasons, we affirm defendant's convictions and sentence.

¶ 86    Affirmed.